CARTER, Judge.
Plaintiff, Lester Arcard Esco, suffered personal injuries by electrical shock when a *154 cherry picker operated by his foreman struck an overhead live electrical transmission line. Among others, he sued four supervisory employees or co-employees of the company for which he worked, all of whom were allegedly insureds under a liability policy issued to his employer, Fremin-Smith Services, Inc., by defendant United States Fire Insurance Company.[1] The trial judge rendered judgment in favor of the four named defendants and dismissed plaintiffs suit with prejudice upon finding that there was “victim fault here sufficient to bar plaintiffs right to recovery.” The trial judge found it unnecessary to decide whether each or all of the four named defendants were individually negligent. The Court of Appeal affirmed the judgment of the trial court.[2]
Thereafter, on plaintiffs writ application, the Louisiana Supreme Court granted cer-tiorari.[3] The Supreme Court concluded that the trial judge was clearly wrong in finding that plaintiff was contributorily negligent and/or had assumed the risk. The Supreme Court reversed this determination, found that two of the four individual defendants, together with their liability insurer, are responsible to plaintiff, and remanded the case to this court for determination of damages.[4]
DAMAGES
On the date of the accident, May 28, 1976, Esco was taken to Terrebonne General Hospital, where he was hospitalized for four days. Following his initial treatment at Terrebonne General Hospital, Esco was then referred by Fremin-Smith Construction Co. to Dr. Pierre Espenan, who first saw Esco on June 7, 1976. Dr. Espenan’s initial examination revealed third-degree burns on the heel of Esco’s left foot about the size of a silver dollar and second-degree burns on the palm of his left hand.
On July 20, 1976, Dr. Espenan hospitalized Esco at Touro Infirmary for eight days and performed a skin graft on the left heel using donor skin from the same leg. Dr. Espenan found no other tissue damage aside from the skin underneath the heel of Esco’s left foot. Espenan opined that the skin graft took 100%.
Dr. Espenan continued to see Esco on the following dates: August 2, 1976; August 4, 1976; August 9, 1976; August 16, 1976; August 23, 1976; September 6, 1976; September 13, 1976; October 4, 1976; October 18, 1976; October 25, 1976; November 1, 1976; November 4, 1976; November 8, 1976; November 15, 1976; November 22, 1976; November 29, 1976; December 8, 1976; December 15, 1976; December 29, 1976; January 12, 1977; January 19, 1977; and March 8, 1977. On these dates, Esco voiced complaints of pain in his leg and foot, as well as headaches and numbness in his left hand, arm and shoulder. At this time, Dr. Espenan referred Esco to Dr. Hoffman, a plastic surgeon, who determined there was nothing wrong with the graft and that the pain would improve without treatment.
On March 23 and 28, 1977, Esco again went to Dr. Espenan with complaints of pain in his left foot. Dr. Espenan, however, advised Esco to return to work. On April 6, 1977, Dr. Espenan noticed a callus on the graft when Esco returned with complaints of pain in his left leg. Esco reiterated his complaints of pain at the graft site on April 20 and May 4, 1977, and Dr. Espenan then referred Esco to Dr. Martin, a neurologist. Dr. Martin reported that in his opinion Esco did not suffer from any nerve damage.
On June 8, 1977, Esco informed Dr. Es-penan that he was improving. Dr. Espen-an excised the callus around the graft, which caused bleeding and discomfort, and *155 then discharged Esco. About a week later, on June 13, 1977, Dr. Espenan again discharged Esco.
Esco continued to see Dr. Espenan with complaints of pain in his left foot and leg and headaches. Dr. Espenan examined Esco on the following dates: July 5, 1977; July 12, 1977; July 20, 1977; August 3, 1977; August 10, 1977; August 17, 1977; and August 24, 1977. Esco also saw Dr. Espenan five times in November and twice in December and was then referred by Dr. Espenan to Dr. Richard Palmer, a neurologist. Dr. Espenan testified that Dr. Palmer had found no neurological deficit in the left leg, but later admitted that Dr. Palmer’s correspondence to him acknowledged a slowing of the nerve conduction velocity to Esco’s lower left extremity.
Dr. Espenan saw Esco again on January 10, 1978, and on January 18, 1978, at which time he diagnosed diabetes. He, however, found no contraindication of Esco returning to work. Esco also saw Dr. Espen-an on February 6, 1978, complaining of pain. Dr. Espenan’s physical examination was negative, and he again discharged Esco.
The last time Dr. Espenan saw Esco, Esco complained of headaches and pain in his left foot, and he had developed calluses over the graft site. Dr. Espenan again excised the callus, found no objective reasons for Esco’s complaints of pain, and told Esco to return to work.
Dr. Espenan testified that over the two year period he treated Esco, Esco’s motivation to return to work was not good. He admitted, however, that from 1976 through 1977, Esco constantly complained of pain in his left foot.
Dr. George Hoffman, a specialist in general surgery and plastic surgery, who had been referred by Dr. Espenan, examined Esco on August 18, 1976. Dr. Hoffman’s examination of Esco showed a well-healed skin graft about an inch and a half in diameter. On this same date, Dr. Hoffman ordered x-rays which were negative. Esco returned to Dr. Hoffman on August 23, 1976, September 23, 1976, November 29, 1976, and March 17,1977. Throughout this time, Esco complained of pain in his left heel. Esco acknowledged to Dr. Hoffman that the special shoes prescribed by Dr. Espenan had given him some relief from the pain.
On March 17, 1977, Dr. Hoffman discharged Esco and recommended that he return to Dr. Espenan for follow-up treatment. Dr. Hoffman’s records do not reflect that Esco was discharged to return to work, but Dr. Hoffman testified in his deposition that at that time Esco should have attempted to return to light duty employment.
Dr. Hoffman saw Esco again on April 30, 1980. Esco complained of continued pain in his left foot. Dr. Hoffman’s examination revealed no problems or objective reasons for Esco’s complaints. On September 29, 1982, Esco once again was presented to Dr. Hoffman, whose examination of Esco’s left heel revealed a well-healed skin graft and a small amount of callus in the graft site. At the time of Esco’s last visit with Dr. Hoffman, Dr. Hoffman determined that he had found nothing which would prevent Esco from returning to work.
In August of 1976, Dr. Hoffman had determined that Esco had pain on a weight-bearing portion of his heel; however, a later report by Dr. Hoffman (August 1980) noted that the injury was on a non-weight-bearing area of the foot.
Dr. Richard Palmer, a neurologist, examined Esco on December 29, 1977. Dr. Palmer also examined Esco on January 5 and January 6, 1978. Esco at this time complained of severe pain in his left leg and foot, as well as headaches. Dr. Palmer’s examinations revealed a slowing of one of the nerves in the left lower extremity, which Dr. Palmer attributed to Esco’s diabetes. Dr. Palmer also determined that Esco was having muscle contraction or tension headaches. Dr. Palmer also found that although Esco was able to walk on his toes, he had difficulty in rising to his heels. Palmer ultimately concluded that Esco was exaggerating his symptoms.
*156 On February 28, 1979, Esco was referred by his attorney to Dr. Charles Mary, an internist. Dr. Mary’s initial examination revealed a well-healed scar on the palm of the left hand and on the sole of Esco’s left foot. The skin graft on the left foot was hard, black and necrotic, and the entire area was sensitive to pressure.
By July of 1979, Esco was still experiencing pain, which continued through December 27, 1979. During this time, Dr. Mary noticed very little improvement. From January through March of 1980, Dr. Mary injected Cortisone into the scar on Esco’s left heel in hopes of relieving the pain. However, the injections helped little, and Dr. Mary discontinued them. At this time, Esco also voiced complaints of sexual problems to Dr. Mary. On July 8, 1980, Dr. Mary referred Esco to Dr. Massiha.
In diagnosing Esco’s physical problems, Dr. Mary was of the opinion that the graft on Esco’s left heel had not healed and had left him with a defect on his heel. The defect was of a serious nature in that it is and will continue to be painful and is unable to bear weight. Dr. Mary opined that Esco is not able to stand for any length of time and, therefore, cannot perform any job which requires him to work or stand for any length of time. Dr. Mary found no indication that Esco was a malingerer. Dr. Mary did not feel that the pain was subjective and felt that by simply looking at the scar one could tell that it was painful.
Dr. Mary referred Esco to Dr. Stuart Phillips, an orthopedic surgeon. Dr. Phillips first saw Esco on March 28, 1979, and saw him at least once a month until June 10, 1982. Esco’s initial complaints were pain in his left shoulder, headaches and soreness in the bottom of his left heel. Esco reported that he could not stand for longer than 2-3 hours without pain in his foot.
Dr. Phillips’ examination revealed calcification of the greater tuberosity, which reflected a healed fracture. Dr. Phillips opined that this condition reasonably explained Esco’s complaints of pain in his left shoulder when working overhead. Dr. Phillips was of the opinion that Esco should refrain from working overhead with his left shoulder for the foreseeable future.
Dr. Phillips’ examination of Esco’s left foot revealed a scar on his heel and a permanent callus in that area. Dr. Phillips determined that that area of Esco’s left heel was painful when standing and that there was a centimeter of atrophy on the calf of that leg.
In an effort to alleviate some of Esco’s pain, Dr. Phillips prescribed conservative treatment, including modification of Esco’s shoe, use of a transcutaneous nerve stimulator (TNS) and medicine to decrease the sensitivity of the nerves in the body. Dr. Phillips stated with regards to the injuries to the heel:
The heel is a very specific organ built to absorb pain. It is made of longitudinal compartments of fat enclosed in fibrous tissue.
These are richly endowed with nerve endings.
When the heel is injured and there is a dissolution in this fine microstructure, it loses its ability to dissipate the force and becomes painful. And this is a protective mechanism. If you get a disease like diabetes or leprosy which destroys the pain receptors and the patients get great big ulcers on their heels.
If you are a middle aged athlete like me and you run around the park, your heel hurts. But when it hurts, you stop. If you don’t have a mechanism to know when you have overdone it, you will just wear it right out. And this fine micros-tructure has been broken in Mr. Esco’s case.
Dr. Phillips’ treatment of Esco was primarily targeted at reducing the callus around the graft site. Dr. Phillips opined:
You can keep it down; you can’t get it well. Callouses (sic) do not get well as long as they have to have unusual pressure. That’s what a callous (sic) is is a response of the skin to unusual pressure.
And since we can’t modify the heel pad on Mr. Esco to dissipate the pressure, he *157 is always going to have an unusual pressure at that area; so if he stands, he will always have a callous (sic). You can treat the callous (sic), and we have been and it has been enough treatment to keep it where it doesn’t grow as a horn, which it really would do if we didn’t treat it, and to keep him comfortable walking at least moderate distances.
Dr. Phillips felt that Esco was not malingering and that a painful heel scar is a common occurrence. Dr. Phillips determined that, due to Esco’s inability to stand, Esco is totally disabled.
Esco was then referred by Dr. Mary to Dr. Hamid Massiha, a plastic surgeon. Dr. Massiha saw Esco on only two occasions, i.e., on July 14, 1980 and on July 1, 1982. Esco reported that he could not stand or walk for a long period of time. He also complained to Dr. Massiha that the pain in his left foot radiates to his knee and that he gets calluses on the area of the graft when he uses his foot.
Dr. Massiha’s examination revealed a well-healed skin graft, which was very tender. When Dr. Massiha pressed on Esco’s scar, Esco impressed him that the expression of pain was sincere. Dr. Mass-iha also found that, between Esco’s first and last visits, the scar on his left heel remained hard, and Dr. Massiha opined that during this two year period the scar should have softened.
Dr. Massiha indicated that due to his injury Esco can not do any type of job which requires him to do a lot of walking or standing. He noted, however, that there would be no limitation on his ability to earn wages if he could do a job seated. Dr. Massiha also recommended a muscle flap surgery to cure the defect in Esco’s left heel, as he does not really know if the pain now experienced by Esco will lessen with time.
On April 27, 1982, Esco’s attorney referred him to Dr. Walter Robinson, a specialist in neurology, psychology and electroencephalography. Esco gave Dr. Robinson a history of having an electrical accident which resulted in his having a skin graft on his left heel. Esco informed Dr. Robinson that he had been out of work since the accident. Esco’s complaints were: pain in the left foot and leg, headaches, pain in and reduced use of his left shoulder and arm. Esco also reported that he was depressed, nervous, shortwinded and had suffered a dimunition in his sex life.
Dr. Robinson performed physical examinations and tests on Esco on four occasions. Specifically, Dr. Robinson saw Esco on April 22, 1982, April 30, 1982, May 5, 1982, and May 18, 1982. His examinations revealed that Esco had a scar on his left hand and that the vibratory sensation on Esco’s left was diminished. Dr. Robinson also noticed that Esco could not heel-toe walk well. Dr. Robinson opined that these findings were consistent with his injury.
Dr. Robinson also found that Esco was of average intelligence and had recent memory trouble. Dr. Robinson felt that as a result of the accident, Esco suffered effects to the central nervous system, including anxiety, depression, memory difficulties, attention deficit, s ?xual dysfunction, headaches and visual motor disorders.
Dr. Robinson continued to see Esco once or twice a month until January 18, 1983. Specifically, Dr. Robinson saw Esco on June 1 and June 16, 1982, July 7 and 21, 1982, August 18, 1982, September 16, 1982, October 12, 1982, November 10 and 24, 1982, December 1 and 9, 1982, and on January 18, 1983. Dr. Robinson determined that Esco was developing a planter’s wart or callus on his left heel. He felt Esco was not malingering in his complaints of pain and that Esco could not have resumed his former employment, primarily because he could not raise his left arm above horizontal or walk on his left heel.
At the time of trial, Lester Esco was a 49-year-old father of three with an eighth grade education. His work history included v/ork as a truck driver, general construction worker and carpenter. Esco testified that he can not do many of the household chores he did before the accident. For *158 example, Esco testified that prior to the accident he cooked, washed clothes, cut grass and washed his car. He also testified that his injuries have prevented him from engaging in many leisurely activities such as playing ball and walking and riding to the shopping center.
Esco further testified that as a result of the accident, he has been unable to return to his former employment, where he made $9.37 an hour or $374.00 a week. Esco has attempted to perform odd jobs like cutting grass, picking up garbage, and carpentry for extra money, but due to his pain he was unable to maintain these odd jobs.
Sadie Esco corroborated her husband’s testimony. Sadie testified that prior to the accident Esco was physically able to do a lot of things including play ball and help around the house. As a result of the accident, Esco’s leg hurts, he has pain in his arm and feet, and he has headaches, which have prevented him from engaging in many activities. His complaints of pain in his left foot and leg, headaches, calluses on the bottom of his left heel, and the inability to lift his left arm above his head have resulted in his being unable to find work. Esco’s inability to work has caused sexual problems to develop which were not present before the accident.
In assessing the medical and lay testimony presented, we determine that Esco suffered a serious and painful injury as a result of the May 28, 1976 accident. The electrical shock resulted in a serious defect on a weight-bearing portion of Esco’s left heel which gave him continuous pain from the date of the accident until the date of trial and which, from all indications, will continue to cause problems. Esco also suffered continuous and recurring headaches, pain in his shoulder and sexual problems which manifested themselves after his injury. Accordingly, we find that an award of $100,000.00 for general damages is appropriate in the instant case.
Additionally, Esco is entitled to recover medical expenses. The evidence established that Esco incurred the following medical bills. Dr. Stuart Phillips’ bill totalled $170.00 and Dr. Walter Robinson charged Esco $2,700.00 for his services. Furthermore, the medical bills Esco accumulated for treatment by Dr. Charles Mary amounted to $883.00. Although the record clearly reflects that Esco was treated by numerous other physicians and was hospitalized on two occasions, a thorough examination of the record does not reveal proof of the costs of these medical services. Therefore, we award Esco $3,753.00 for medical expenses.[5]
Having determined the general damages to which Esco is entitled, we must determine the amount of past and future lost wages.
Nathaniel Fentress, an expert in vocational rehabilitation, testified at trial. Fen-tress found that at the time of his examination, Esco was a 49-year-old man, had completed the seventh grade, and had performed construction work throughout his adult employment, primarily performing common labor, painting and carpentry work. Mr. Fentress administered a wide range of achievement tests to Esco to determine the type of sedentary labor Esco was capable of performing. The results of those tests are as follows:

*159 Fentress also determined that Esco was a good worker, had a good employment record, and was interested in working.
Fentress opined that based on Esco’s limitations, i.e., that he was physically unable to stand or walk for long periods of time and had frequent headaches, Esco was no longer able to do work classified as heavy labor employment. However, Fen-tress noted that if Esco had no functional limitations, then he could return to carpentry. Fentress also determined that Esco has the raw potential to re-enter the work force, but is in need of at least one year of rehabilitation services. After being rehabilitated, Esco, in Fentress’ opinion, will be eligible for work assembling objects in a factory, bench work activity or work as a night watchman.
Upon re-entry into the labor force, Fen-tress determined that Esco would earn from $3.35 to $4.00 an hour. Fentress noted, however, that the unemployment rate for unskilled wage earners is quite high.
The uncontested testimony of Dr. Nelvin Wolfson, an economic expert, was the only evidence presented which established the amount of Esco’s lost wages. Dr. Wolfson estimated that between the date of the accident and the date of trial, Esco had lost wages of $117,370.00. This calculation was based on 38.5 hours of work per week (with no overtime) and assumed that Esco engaged in no employment between the date of the accident and the date of trial.
In calculating the future lost wages, Dr. Wolfson included minimum wage earning capacity and a 6% increase in the minimum wage per year beginning in 1983. His calculation of Esco’s future lost wages to-talled $206,614.00.
The medical testimony clearly established that Esco was and is now unable to return to his former occupation as a manual laborer. Other expert testimony established that Esco had, as a result of his injury, suffered a dimunition in his earning capacity. Accordingly, we find that an award of $117,370.00 for past lost wages and an award of $206,614.00 for future lost wages is appropriate.[6]
CONCLUSION
For the above reasons, the judgment is rendered in favor of plaintiff and against Aubrey “Bill” Bass, C. Randall Dixon, and their liability insurer United States Fire Insurance Company for $100,000.00 for general damages, $3,753.00 for medical expense, $117,370.00 for past lost wages, and $206,614.00 for future lost wages. Costs are assessed against defendants Aubrey “Bill” Bass, C. Randall Dixon, and their liability insurer United States Fire Insurance Company.
RENDERED.

.Plaintiff was injured on May 28, 1976. LSA-R.S. 23:1032 was amended by Acts 1976, No. 147, § 1, effective October 1, 1976, to bar tort claims against co-employees, except when liability arises from an intentional act.

. Esco v. Smith, 457 So.2d 786 (La.App. 1st Cir.1984).

. Esco v. Smith, 461 So.2d 322 (La.1984).

. Esco v. Smith, 468 So.2d 1169 (La.1985).

. In brief, counsel for defendant alleges that defendant North River Insurance Company (compensation insurer) is entitled to reimbursement of $15,748.95 for weekly worker’s compensation and medical benefits paid. In addition, defendant claims that Esco was paid $25,000.00 as a lump sum settlement of his worker’s compensation claim, for which North River Insurance Company is entitled to reimbursement. The record does not reveal any stipulation or other proof as to the intervenor’s claim for reimbursement. However, even if. proof had been adduced or a stipulation entered into, the adverse judgment of the trial court was not appealed by intervenor North River Insurance Company, and therefore, the judgment rejecting intervenor’s claim is now final.

. See footnote 5 supra.